## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| **CEDA MILLS, INC.,** | : | **Bankruptcy No. 04-24452 BM** |
| | : | |
| | : | |
| **Debtor** | : | **Chapter 11** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | | |
|---|---|---|
| **CEDA MILLS, INC., a corporation, and** | : | |
| **CHESTER E. DUFFY, an individual** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **Adversary No. 05-2271 BM** |
| | : | |
| **SKY BANK,** | : | **Trial On Complaint For Breach Of** |
| | : | **Written Contract And Breach Of** |
| **Defendant** | : | **Oral Contract** |

Appearances:   Robert O Lampl, Esq., for Plaintiffs
Jeffrey J. Lorek, Esq., for Defendant

### MEMORANDUM OPINION

Debtor Ceda Mills, Inc. and Mr. Chet Duffy, its president and majority shareholder, have brought this breach of contract action against defendant Sky Bank ("Bank"). They maintain that Bank breached an agreement it had with them to finance debtor's acquisition of the assets of another corporation and seek to recover their respective losses resulting from the alleged breach.

Bank denies that it ever had such an agreement with debtor and Mr. Duffy and insists that they are not entitled to an award of monetary damages.

Judgment will be entered in favor of Bank and against debtor and Mr. Duffy for reasons set forth in this memorandum opinion.

## – I –

## BACKGROUND

Debtor owns and operates a rolling mill located in New Castle, Pennsylvania.

Mr. Chet Duffy is debtor's president and owns eighty-three percent of its shares.

Mr. Gerald Prestopine was a commercial loan officer and a vice-president of Bank during the years 2000 and 2001.

Mr. Duffy approached Bank in January of 2000 about obtaining financing for the purchase of the real property and equipment of New Castle Rolling Mills. His contact at Bank was Mr. Prestopine. Mr. Duffy consulted with his attorney at all critical stages of the negotiations.

Early on in the negotiations, Mr. Duffy decided to pursue a loan from Pennsylvania Economic Financing Authority ("PEDFA"), as the rate of interest was lower than it was for a traditional commercial loan. A PEDFA loan requires a master bank, in this instance PNC Bank, to secure the loan by issuing a letter of credit and a standby letter of credit issued by another bank, in this instance Sky Bank, to guarantee repayment to the master bank.

PEDFA eventually approved the loan application and scheduled it for final closing in December of 2000. As a pre-condition to participating in the December bond pool, however, Mr. Duffy was required to already have obtained a standby letter of credit from Bank.

- 2 -

Mr. Prestopine notified Mr. Duffy on August 31, 2000, that Bank had approved his request for it to participate in the PEDFA project. He further stated that its participation was subject to terms and conditions contained in a commitment letter that would arrive shortly.

Bank issued a commitment letter on September 5, 2000, for two separate loan facilities. Facility A was for a standby letter of credit in the amount of $2,786,050 to support the PEDFA loan. Facility B was for a line of credit in an amount not to exceed $600,000.

Included among the terms and conditions for Facility A was a requirement that debtor grant Bank a mortgage against the real property debtor was to purchase from New Castle Rolling Mills. Mr. and Mrs. Duffy were required to grant Bank a second mortgage against their personal residence and to personally guarantee repayment of the loan. In addition, debtor was required to grant Bank a first position security interest in all of debtor's equipment, fixtures, furniture and general intangibles. Finally, as additional security for the loan, debtor was required to purchase a residual value insurance ("RVI") policy, with all premiums pre-paid and Bank named as beneficiary.

With respect to Facility B, debtor was required to grant Bank a first position security interest in all of its present and future accounts and inventory. Bank also was to be granted a second position security interest in all of debtor's machinery, equipment, fixtures and general intangibles.

- 3 -

Paragraph 4.6 of the commitment letter provided as follows:

> This Commitment may be accepted by signing the Acceptance set forth below and by returning it within ten (10) days of the date hereof. Unless this Commitment is so accepted, the same shall be invalid and not binding upon Lender.

The final page of the commitment letter contained a line for Mr. Duffy to sign the commitment letter on behalf of debtor as its president. It also contained lines for Mr. and Mrs. Duffy to sign as guarantors. Immediately above the signature lines was the following language:

> Intending to be legally bound, the undersigned hereby accepts the foregoing commitment and agrees to all of the terms and conditions as stated above and hereby acknowledges that those terms and conditions shall remain in full force and effect as part of the loan documents following the close of this transaction and throughout the term of the loans.

Paragraph 4.7 of the commitment letter stated that time was of the essence with respect to each and every provision of the commitment letter and that Bank's commitment would terminate without any liability by Bank if the loan closing did not occur or before December 15, 2000.

Debtor and Mr. and Mrs. Duffy never signed and returned the commitment letter to Bank.

A loan pre-closing was held on December 4, 2000, at the office of counsel to PEDFA. Mr. Prestopine, and Mr. Duffy and his attorney and his accountant were in attendance, as were PEDFA's counsel and PNC Bank. The final closing was scheduled for December 12, 2000.

- 4 -

Bank and Mr. Duffy executed all the necessary documents for the loan at the pre-closing.  Debtor and Mr. and Mrs. Duffy had not, however, signed and returned to Bank the commitment letter of September 5, 2000.

Debtor was required at the pre-closing to pay certain fees and costs totaling $72,891.56.  Payment was non-negotiable and non-refundable and had to be paid in advance of the final closing.

Debtor, however, did not have sufficient funds at that time to pay the fees and costs.  After Mr. Prestopine informed Mr. Duffy that he would be reimbursed out of the loan proceeds at the final closing if he paid the fees and costs out of his own pocket, Mr. Duffy wrote a check drawn on his personal account and delivered it to counsel for PEDFA.

After executing all of the documents for Bank, Mr. Prestopine stated that debtor and Mr. and Mrs. Duffy had not signed and returned the commitment letter and informed Mr. Duffy that there still was time for them to do so prior to the final closing set for December 12, 2000.

Counsel to PEDFA then prepared an escrow agreement which Mr. Duffy signed on behalf of debtor as its president.  The letter provided that counsel to PEDFA would hold until December 12, 2000, all the documents executed by Mr. Duffy and Bank as well as the letter of credit issued by PNC Bank.  Counsel to PEDFA would release the documents only upon written notification to do so from Bank or its counsel.  Absent such notification, all the documents the parties had executed would become null and void.

- 5 -

The escrow letter provided in part as follows:

[..., the Borrower acknowledges that neither PEDFA, the Trustee, Sky Bank nor PNC Bank ... shall have any liability in connection with the Project. Additionally, Borrower acknowledges that all fees paid and costs incurred in connection with the Project shall not be reimbursed.

Two days later, on December 6, 2000, Mr. Duffy presented a proposal to Bank he called "Plan B". Among other things, Mr. Duffy proposed that Bank issue the standby letter of credit but release only $2,000,000 of it so that debtor could purchase the real property, equipment and inventory and pay closing costs and professional fees. Bank would place the remaining $800,000 in a cash collateral account over which it would have exclusive control. He further proposed that Bank allow him an additional six months to purchase an RVI policy or to raise an additional $500,000 in equity in lieu of purchasing an RVI policy. Should he fail to accomplish either of these alternatives, Bank could call its standby letter of credit.

Bank rejected "Plan B' on December 12, 2000. As a consequence, the final closing scheduled for that day did not go forward and PEDFA funds were not disbursed to debtor.

Negotiations between Mr. Duffy and Bank did not come to an end once the final closing date passed. They met again on December 18, 2000, to discuss whether an agreement could still be reached.

On December 19, 2000, Mr. Duffy proposed to Mr. Prestopine that Mr. Duffy purchase an RVI policy in the amount of $1,500,000 to protect Bank in the event of a default by debtor and after liquidation of its assets. Coverage under the policy would be effective for eighty-four months.

- 6 -

Bank issued a second commitment letter on January 19, 2001.  At the request of PEDFA, the amount of Facility A was increased from $2,786,850 to $2,800,000.  Except for this change, the second commitment letter was virtually identical to the first.  In particular, it required debtor and Mr. and Mrs. Duffy to indicate their acceptance of its terms and conditions by signing and returning it to Bank within ten days.  The only other change of significance was that the loan had to close on or before April 16, 2001 or the terms and conditions set forth in the second commitment would expire.

As was the case with the first commitment letter, debtor and Mr. and Mrs. Duffy did not sign the second commitment letter indicating their acceptance of its terms and conditions and did not return it to Bank within ten days.   Mr. Duffy instead sent a fax to Mr. Prestopine on February 9, 2001, proposing other changes to the terms and conditions of the loan.

Among other things, Mr. Duffy proposed that Bank reduce the amount of Facility A from $2,800,000 to $2,000,000.  The fax concluded with the following comment by Mr. Duffy:

> Tom, Dan and I are appreciative of your efforts to this point in trying to help with these issues.  We trust our request to reduce the amount of the loan from $2,800,000 to $2,000,000 and our reasoning for the same will be strongly considered by Sky Bank for our loan approval *in the very near future.*

Bank issued a third commitment letter on February 15, 2001, which reduced the amount of Facility A, as Mr. Duffy had requested, to $2,000.000.  In addition, an RVI policy was not required.  PEDFA would no longer be involved in the loan and would be replaced

AO 72A
(Rev. 8/82)

by the Small Business Administration ("SBA"), which would guarantee repayment of the loan up to a certain amount.

As was the case with the first and second commitment letters, debtor and Mr. and Mrs. Duffy were required to indicate their acceptance of the terms and conditions of the third commitment letter by signing and returning it to Bank within ten days. For the third time, debtor and Mr. and Mrs. Duffy did not do so.

Unbeknown to Bank, Mr. Duffy was shopping around in the meantime for another bank to finance debtor's acquisition of the assets of New Castle Rolling Mills while also continuing to negotiate with Bank.

First Merit Bank issued a commitment letter on March 26, 2001, offering to provide $3,000,000 in financing. Four facilities were proposed. Facility #1 was a line of credit in the amount of $600,000 and was for working capital. Facility #2 was in the amount of $205,000 and was for the purchase of the real property of New Castle Rolling Mills. Facility #3 was in the amount of $1,668,000 and was for the purchase of its equipment. Facility #4 was in the amount of $527,000 and was for the upgrading of the equipment.

The proposed loan was to be secured by a commercial mortgage on the real property and security interests in certain tangible and intangible items. No governmental entity would be involved in the loan.

Mr. Duffy sent a fax to his attorney the following day asking counsel to review the commitment letter from First Merit Bank. Mr. Duffy further noted that, according to Mr. Prestopine, would be "ready to close some day next week".

- 8 -

In response to further proposals by Mr. Duffy, Bank issued a fourth commitment letter on March 28, 2001.  Among other things, Facility A was reduced in amount from $2,000,000 to $1,250,000.  As was the case with the previous three commitment letters, debtor and Mr. and Mrs. Duffy were required to indicate their acceptance of the proposed terms and conditions by signing and returning it to Bank within ten days.

Once again they did not do so. Debtor and Mr. Duffy instead signed and promptly returned the commitment letter issued by First Merit Bank.  A closing on the loan from First Merit Bank took place shortly thereafter.

Debtor filed a voluntary chapter 11 petition approximately three years later on April 2, 2004.  The attached schedules listed assets with a declared value of $8,906,400 and liabilities totaling $3,414,309.  First Merit Bank was listed as a secured creditor with liens against debtor's real property and equipment totaling $2,905,000.  Included among the assets of the bankruptcy estate was a lawsuit against Bank with an unknown value.

Debtor and Mr. Duffy commenced this adversary action against Bank on February 26, 2005.  Count I of the complaint asserts a claim for breach of a written contract to provide financing.  Count II asserts a claim for breach of an oral contract.[1]

Debtor's modified amended plan of reorganization was confirmed after a hearing on June 24, 2005. An appeal by another party of the order of confirmation presently is pending in the District Court.

This matter has been tried and is now ready for decision.

---

[1]  Count III of the complaint asserted a claim for fraud against Bank in connection with an alleged agreement with Bank to provide financing.  This count subsequently was dismissed and no longer is at issue here.

- 9 -

-II-

## SUBJECT- MATTER JURISDICTION

Plaintiffs in this case seek relief in the form of monetary damages.  Mr. Duffy seeks to recover $234,000 *of his own funds* he claims to have expended in attempting to obtain financing for debtor from Bank.  Included in this amount is $72,891.56 of his own funds he spent to pay fees and costs at the pre-closing on December 4, 2000.  Debtor seeks to recover $931,2000 in higher costs it claims to have incurred in having to turn to First Merit Bank after Bank allegedly breached its agreement to provide financing.

The question arises at the outset whether we have jurisdiction over the quest of Mr. Duffy in this adversary action to recover his own out-of-pocket expenses arising from Bank's alleged breach of contract.

We will address this issue before turning to the merits of plaintiffs' claims even though Bank has not has not raised it.  As a federal court with limited jurisdiction, we have an independent obligation to satisfy ourselves that subject-matter jurisdiction exists when it is in doubt. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 278, 97 S.Ct. 560, 571-72, 50 L.Ed.2d 471 (1977).  It is a necessary corollary of this proposition that a federal court may *sua sponte* raise the issue of subject-matter jurisdiction. *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 76-77 (3d Cir. 2003), *cert. denied*, 541 U.S. 959, 124 S.Ct. 1714, 158 L.Ed.2d 400 (2004).

Upon referral from the district court, a bankruptcy court has jurisdiction over four types of proceedings: (1) cases under title 11; (2) proceedings arising under title 11; (3) proceedings in a case under title 11; and (4) proceedings related to a case under title 11.

AO 72A
(Rev. 8/82)

11 U.S.C. § 1334(a)-(b).  The first three types of jurisdiction commonly are characterized as "core", while the fourth is "non-core".  *In re Resorts International, Inc.*, 372 F.3d 154, 162 (3d Cir. 2004).

We need not concern ourselves with the specifics of the first three categories of bankruptcy jurisdiction.  We need consider only the fourth category, as it is the broadest.  *In re Insulfoams, Inc.*, 104 F.3d 547, 552 (3d Cir. 1997).  That is to say, if "related to" jurisdiction is absent, jurisdiction pursuant to any of the other three types of bankruptcy jurisdiction also is absent.

"Related to" jurisdiction is "comprehensive".  It was created by Congress so a bankruptcy court could deal "effectively and expeditiously" with matters connected to a bankruptcy estate. *Celotex Corp. v. Edwards*, 514 U.S. 300, 308, 115 S.Ct. 1493, 1499, 131 L.Ed.2d 403 (1995).  Its scope, however, "cannot be limitless".  *Id.*

A bankruptcy court has "related to" jurisdiction with respect to a proceeding in bankruptcy if "the outcome of that proceeding could conceivably have an effect on the estate being administered in bankruptcy". *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984).   The operative term in this standard is "conceivably".   Certainty or even likelihood is not required. *In re Marcus Hook Development Park, Inc.*, 943 F.2d 261, 264 (3d Cir. 1991).

Debtor's plan of reorganization was confirmed some six months before this adversary action was tried.  Unless a confirmed plan provides otherwise, which it did not in this instance, all the property that previously vested in the bankruptcy estate vests in the debtor upon its confirmation. *See* 11 U.S.C. § 1141(b).  It might appear to follow from

- 11 -

AO 72A
(Rev. 8/82)

this provision of the Bankruptcy Code that this adversary action is no longer part of the bankruptcy estate and its outcome consequently can have no conceivable effect on it.

Some courts, however, have found "related to" jurisdiction to be present in a post-confirmation context by applying the *Pacor* standard less literally than in a pre-confirmation context. *In re Resorts International*, 372 F.3d at 165.

The critical inquiry in a post-confirmation context is whether the proceeding is an "integral part of the bankruptcy process" and there is a sufficiently "close nexus" to the confirmed plan. *Id.*, 372 F.3d at 166-67. While there is no bright-line test for determining how close that nexus must be, matters affecting the interpretation, implementation, consummation, execution or administration of a confirmed plan normally would be an integral part of the bankruptcy process and consequently would have a sufficiently "close nexus" for jurisdictional purposes. *Id.*, 372 F.3d at 167.

Applying this standard for post-confirmation matters to this case, we conclude that a sufficiently "close nexus" is *not* present for "related to" jurisdiction to exist with respect to Mr. Duffy's quest to recover his own out-of-pocket expenses from Bank.

Of the above-listed matters normally having a sufficiently "close nexus" to confer post-confirmation jurisdiction, the most plausible candidate in this instance is plan execution. Is there a sufficiently "close nexus" between Mr. Duffy's quest to recover out-of-pocket costs he incurred while debtor was negotiating with Bank for financing and execution of debtor's confirmed plan to confer at least "related to" jurisdiction?

- 12 -

We conclude after reviewing the provisions of debtor's confirmed plan that no such "close nexus" exists in this instance.  Recovery of these expenses by Mr. Duffy would *not* have any effect on the execution of debtor's confirmed plan.

According to the provisions of the confirmed plan, funding for its execution will come from anticipated insurance proceeds debtor expects to recover in another adversary action and from debtor's ongoing business operations.  The plan further projects that with its plant fully operational, debtor will be able to obtain investments and financing from third parties to provide additional funds to support its reorganization obligations.  Should debtor not prevail in the other adversary action, debtor projects that no creditor will be paid except for creditors with secured or administrative claims.

There is nothing in the confirmed plan or, for that matter, anything else in this case indicating that any recovery by Mr. Duffy in his own right will be used to assist debtor in meeting its plan obligations.  It instead appears that Mr. Duffy merely seeks to make himself whole again and does not intend to make any recovery on his part available to pay debtor's pre-petition creditors.  The statement in the plan that debtor "will likely will be able" to entice financing by third-parties is too vague and non-specific to warrant the inference that any recovery had by Mr. Duffy in his own right might be utilized to finance debtor's reorganization.

While in some respect it is conceivable that Mr. Duffy might so utilize anything he recovers in his own right, such conceivability in our estimation goes beyond the limits contemplated in *Pacor.*  While it unquestionably is broad in scope, "related to" jurisdiction "cannot be limitless". *Celotex*, 514 U.S. at 308, 115 S.Ct. at 1499.  To hold that the bare

- 13 -

AO 72A
(Rev. 8/82)

and purely abstract possibility that Mr. Duffy will dedicate any recovery in his own right to execution of debtor's confirmed plan gives rise to "related to" jurisdiction would expand the scope of "related to" jurisdiction to an extent that would render it virtually meaningless.

The conclusion that we lack "related to" jurisdiction over Mr. Duffy's quest to recover his out-of-pocket costs is not undermined by a provision in debtor's chapter 11 plan providing for retention of jurisdiction by this court to determine any and all adversary proceedings pending on the effective date of the plan.   A provision in a confirmed plan retaining jurisdiction over a matter does not *ipso facto* confer jurisdiction upon a bankruptcy court. *U.S. Trustee v. Gryphon at Stone Mansion*, 216 B.R. 764, 769 (W.D. Pa. 1997), *aff'd*, 166 F.3d 552 (3d Cir. 1999).   If jurisdiction is lacking under 28 U.S.C. § 1334 or 28 U.S.C. § 157, a provision in a plan of reorganization reserving jurisdiction is unavailing. *In re Resorts International*, 372 F.3d at 161.

We conclude in light of the foregoing considerations that subject-matter jurisdiction is absent with respect to Mr. Duffy's quest to recover in his own right funds he spent out of his own pocket in attempting to procure financing for debtor from Bank.

AO 72A
(Rev. 8/82)

## – III –

## BREACH OF CONTRACT

Even if we had jurisdiction over Mr. Duffy's claim for breach of contract, the claim he and debtor make that Bank breached a contract it had with them to provide financing must fail on the merits.

A contract may be manifest in writing, orally, or by the acts or conduct of the parties. *Sullivan v. Hartwell Investment Partners*, 873 A.2d 710, 716 (Pa. Super. 2005).

For there to be an enforceable contract, there must be an offer, an acceptance and consideration given. *Reed v. Pittsburgh Board of Public Education*, 862 A.2d 131, 134 (Pa. Cmwlth. 2004). A "meeting of the minds" must occur, whereby the parties assent to the same thing, as evidenced by an offer and its acceptance. *Mountain Properties, Inc. v. Tyler Hill Realty Corp.*, 767 A.2d 1096, 1101 (Pa. Super.), *appeal denied*, 566 Pa. 666, 782 A.2d 547 (2001).

An offer may accepted (or not) by conduct. What parties do with respect to an offer may be probative in ascertaining whether the offer was accepted. *O'Brien v. Nationwide Mutual Insurance Co.*, 425 Pa. Super. 335, 340, 625 A.2d 75, 78 (1993). Whether specific conduct indicates acceptance of an offer depends on what a reasonable person in the position of the parties would understand by a party's conduct. *Temple University Hospital, Inc. v. HealthCare Management Alternatives, Inc., 764 A.2d 587, 593,* (Pa. Super. 2000), *appeal denied*, 566 Pa. 647, 781 A.2d 147 (2001).

Acceptance of an offer must be absolute and unconditional for there to be a contract. *O'Brien*, 455 Pa. Super. at 577, 689 A.2d at 258-59. A response which proposes

AO 72A
(Rev. 8/82)

changing the terms of an offer does not constitute acceptance of it, but instead is a counter-offer. *AccuWeather, Inc. v. Thomas Broadcasting Co., Inc.*, 425 Pa. Super. 335, 339, 625 A.2d 75, 78 (1993). It effectively terminates the offer originally made. *Temple University Hospital*, 764 A.2d at 593.

Debtor and Mr. Duffy concede that there was no written agreement for financing from Bank.[2] They instead maintain that there was an *oral* agreement for Bank to provide financing. The oral agreement, they assert, was arrived at *before* the commitment letter issued on September 5, 2000, and subsequently was breached by Bank when it did not go forward with the final closing on December 12, 2000.

Their admitted failure to indicate acceptance of the terms and conditions of the September 5, 2000 commitment letter by signing and returning it Bank, debtor and Mr. Duffy maintain, was of no consequence because an oral agreement was reached prior to September 5, 2000. There was, in other words, no need for them to sign and return it. Doing so would have been superfluous.

To prevail in an action for breach of contract, debtor and Mr. Duffy must demonstrate: (1) the existence of an enforceable contract; (2) a breach of a duty imposed by the contract; and (3) damages sustained as a result of the breach. *Hart v Arnold*, 884 A. 2d 316, 332 (Pa. Super. 2005).

The threshold issue we must decide is whether the first of these requirements is satisfied in this instance. We conclude for reasons set forth below that it is not satisfied.

---

[2.] Plaintiffs effectively conceded at trial that Count I of their complaint has no merit.

The evidence presented at trial overwhelmingly establishes that debtor and Mr. Duffy never accepted the terms and conditions proposed by Bank for it to provide financing.

Aside from self-serving testimony by Mr. Duffy that an agreement had been reached prior to September 5, 2000, plaintiffs offered little or no evidence concerning what transpired prior to September 5, 2000, which would support the contention that they had reached an agreement with Bank.

In the first place, the language of the commitment letter of September 5, 2000, is inconsistent with the contention that an agreement had been reached prior to September 5, 2000.  The commitment letter opens with the statement that Bank had approved their request for a loan subject to the terms and conditions set forth in the commitment letter. The next sentence goes on to state that "The following terms and conditions *are hereby offered"*.  We would not expect such language had an agreement already been reached.

Moreover, paragraph 4.6 of the commitment letter states that Bank's commitment could be accepted only by debtor and Mr. and Mrs. Duffy signing the commitment letter to indicate their acceptance of its terms and conditions and returning it to Bank within ten days.  It is difficult to understand why Bank would explicitly require a written acceptance if an agreement for financing had already been reached before the commitment letter issued.

These considerations obviously are not conclusive in ascertaining whether an enforceable agreement for Bank to provide financing existed prior to September 5, 2000. There is, however, additional evidence compelling the conclusion that no such agreement ever existed.

- 17 -

Instead of pointing to evidence concerning what happened prior to September 5, 2000, debtor and Mr. Duffy call our attention to the conduct of the parties *after* September 5, 2000.   For instance, they point out: that Mr. Duffy had presented a sample RVI policy to Bank for its approval; that Mr. and Mrs. Duffy had executed personal guarantees as called for in the commitment letter; and that Bank executed all of the required documents at the pre-closing on December 4, 2000, which were necessary for the final closing scheduled for December 12, 2000.

We disagree that such conduct suffices to establish that debtor and Mr. Duffy had reached agreement with Bank for financing prior to September 5, 2000.  Other evidence conveniently ignored by debtor and Mr. Duffy overwhelmingly establishes that no such agreement was reached on September 5, 2000, or at any time thereafter.

On September 18, only a few days after the deadline for signing and returning the first commitment letter had passed, Mr. Duffy's attorney sent a *revised* draft of the commitment letter to counsel for Bank. Mr. Duffy's attorney expressed the hope that an agreement could be reached.  This strongly suggests that debtor and Mr. Duffy had not reached agreement with Bank concerning financing prior to September 5, 2000.  The cover letter accompanying the revisions makes it clear that debtor and Mr. Duffy were making a counter-offer.  Were it otherwise, we would be at a loss to understand the reason for the proposed revisions.

Mr. Duffy sent a memo to his attorney on October 19, 2000, wherein he states that they needed to sign Bank's commitment letter.  This undercuts the contention that an oral

- 18 -

agreement was reached prior to September 5, 2000.  It indicates that Mr. Duffy knew the first commitment letter had to be signed before Bank would agree to providing financing.

The matter does end there.  On November 16, 2000, Mr. Duffy sent a memo to an individual at Bank other than Mr. Prestopine indicating that Mr. Duffy had asked Bank if it would consider a conventional loan instead of a PEDFA loan, as the latter had become "very burdensome and expensive".  This memo indicates that debtor and Mr. Duffy had not accepted the terms and conditions of the commitment letter issued on September 5, 2000, by as late as November 16, 2000.

Events transpiring at the pre-closing also indicate that no agreement concerning financing had been reached with Bank by December 4, 2000.

Mr. Duffy attended the pre-closing with his attorney and his accountant.  Mr. Prestopine attended as the representative of Bank.

After executing loan documents on behalf of Bank, Mr. Prestopine informed those persons in attendance at the pre-closing that the commitment letter of September 5, 2000, had not been signed and returned.  He further stated that there still was time for debtor and Mr. and Mrs. Duffy to do so before the final closing set for December 12, 2000.

Counsel to PEDFA at that point prepared a letter which provided that counsel would hold the documents in question in escrow until December 12, 2000, and would release them only upon written notice to do so from Bank or Bank's counsel.  The letter recited that debtor acknowledged that neither PEDFA, the trustee, PNC Bank, *nor Bank* would have any liability after December 12, 2000, unless Bank told counsel to PEDFA to release the documents executed on December 4, 2000.

- 19 -

In the presence of his attorney, Mr. Duffy signed the escrow without any protest. Because his attorney was present, we have to assume that Mr. Duffy was fully apprised of the significance of what he was doing. If he and debtor allegedly had reached agreement with Bank prior to September 5, 2000, we would at the very least expect Mr. Duffy to protest before signing the escrow letter. There is no evidence indicating that Mr. Duffy protested; he instead obligingly signed the escrow letter.

There is still further evidence indicating that debtor and Mr. Duffy had not previously reached agreement with Bank concerning financing.

On December 6, 2000, two days after he had executed the escrow letter, Mr. Duffy presented to Bank what he denominated as "Plan B", wherein Mr. Duffy proposed other modifications of the terms and conditions set forth in the commitment letter of September 5, 2000. "Plan B' amounted to yet another counter-offer by debtor and Mr. Duffy. It indicates that as of December 6, 2000, debtor and Mr. Duffy still had not reached agreement with Bank to provide financing.

We conclude from the foregoing that as late as December 12, 2000, debtor and Mr. Duffy had not entered into an agreement for financing and that Bank therefore did not commit any breach thereof when it refused to go forward with the final closing on December 12, 2000.

The matter does end there. We further conclude that no such agreement for financing was reached at any rime *after* December 12, 2000.

On December 19, 2000, for instance, Mr. Duffy sent a letter to Mr. Prestopine wherein Mr. Duffy proposed reducing the amount of RVI coverage from $2,800,000 to

- 20 -

$1,500,000. The proposal deviated from the terms and conditions set forth in the commitment letter issued on September 5, 2000, and amounted to another counter-offer. The record does not indicate that Bank considered, let alone accepted, the counter-offer.

On January 17, 2001, Mr. Duffy faxed a memo to his attorney about obtaining financing from another lender in the amount of $2,000,000 and asking Bank to support the PEDFA loan to the extent of only $868,000 without requiring debtor to purchase an RVI policy. While it is not clear from the record whether such a proposal was made to Bank, the fax indicates that Mr. Duffy understood that as of January 17, 2001, he and debtor had not yet reached agreement with Bank for financing.

Bank issued a second commitment letter on January 19, 2001. The only salient difference from the commitment letter issued on September 5, 2000, was a change in Facility A. At the request of PEDFA, the amount was rounded up from $2,786,570 to $2,800,000. The "drop dead" date for final closing was moved back to April 16, 2001.

Further evidence that debtor and Mr. Duffy had not yet come to an agreement with Bank is found in a memo Mr. Duffy faxed to his attorney and to his accountant on February 5, 2001. Among other things, Mr. Duffy ruminated about asking Bank to "sign off" on requiring debtor to purchase an RVI policy for only three years as opposed to the term of the loan. At the end of the second year, Bank could decide whether "to stay in or not". If it chose not to, Mr. Duffy would have one year to refinance through another lender. If Mr. Duffy was not able to refinance, Bank could "call the loan" at the end of the third year. Mr. Duffy also considered asking Bank to reduce the amount of its loan from $2,800,000 to $2,000,000 and to hold $800,000 of the loan proceeds and release them when debtor

AO 72A
(Rev. 8/82)

showed a $500,000 profit.  Once again, these ruminations indicate that Mr. Duffy understood that he and debtor still had not reached agreement with Bank for financing.

Bank issued a third commitment letter on February 15, 2001.  Among other things, Bank offered to reduce the amount of Facility A to $2,000,000 and to replace the requirement of an RVI policy with a standard commercial loan guaranteed in part by SBA. Its issuance lends further support to the proposition that an agreement had not yet been reached and the parties were still negotiating as of February 15, 2001.

As was the case with the two previous commitment letters, debtor and Mr. and Mrs. Duffy were required to sign the commitment letter indicating their acceptance of its terms and conditions and to return it within ten days.  Once again, they did not sign and return the commitment letter to Bank.

Unbeknown to Bank, Mr. Duffy began negotiating with First Merit Bank for financing, which then issued a commitment letter on March 26, 2001.  Among other things, First Merit Bank offered four separate credit facilities totaling $3,000,000.  The commitment letter required Mr. Duffy to sign it on behalf of debtor and himself and to return it within ten days.

Mr. Duffy signed the commitment letter as required and ultimately closed on the loan from First Merit Bank.

To summarize, the above evidence overwhelmingly establishes that debtor and Mr. Duffy never reached an agreement with Bank for financing.  It follows straightaway from this proposition that the cause of action for breach of contract brought by debtor and Mr.

- 22 -

Duffy fails because the first of the requirements of an action for breach of contract was not satisfied.

## – IV –

## PROMISSORY ESTOPPEL

Debtor was required at the pre-closing held on December 4, 2000, to pay certain fees and costs totaling $72,891.56.  The payment was not refundable and had to be paid prior to the final closing, which was scheduled for December 12, 2000.

Debtor, however, lacked the funds to pay the required fees and costs.  After Mr. Prestopine explained to Mr. Duffy that he would be reimbursed out of the loan proceeds at the final closing, Mr. Duffy wrote a check drawn on his personal bank account in the amount of $72,891.56 and paid the fees and costs out of his own pocket.  Because the final closing never took place, Mr. Duffy was never reimbursed.

Mr. Duffy maintains in a post-trial brief that even if there was not an enforceable agreement for Bank to provide financing, he nonetheless is entitled under the theory of promissory estoppel to recover from Bank this out-of-pocket payment.

We previously concluded that we have no jurisdiction to hear any attempt by Mr. Duffy in this adversary action to recover in his right.   Even if we had such jurisdiction, his quest to recover from Bank under the theory of promissory would fail.

To prevail under the theory of promissory estoppel, one must prove that: (1) the promisor made a promise that might reasonably be expected to induce action or forbearance by the promise; (2) the promisee took action or refrained from taking action in reliance upon the promise; and (3) injustice can be avoided only by enforcing the

promise. *Crouse v. Cyclops Industries, Inc.*, 560 Pa. 394, 402-03, 745 A.2d 606, 610 (2000).

A factor that may be considered in connection with the second requirement is whether the promisee's reliance was reasonable under the circumstances presented. *Shoemaker v. Commonwealth Bank*, 700 A.2d 1003, 1008 (Pa. Super. 1997).

The party invoking promissory estoppel has the burden of proving all of the above requirements by a preponderance of the evidence. *Thatcher's Drug Store of West Goshen, Inc. v. Consolidated Supermarkets,* 535 Pa. 469, 477, 636 A.2d 156, 160 (1994).

Not all of the above requirements are satisfied in this case.

In the first place, we are not convinced that Mr. Prestopine *promised* anything to Mr. Duffy when he told Mr. Duffy on December 4, 2000, that Mr. Duffy would be reimbursed at the final closing if he paid the above fees and costs out of own pocket. We regard Mr. Prestopine's statement as a "preview of coming attractions" at the final closing rather than as a promise.

Even if Mr. Prestopine did make a promise to Mr. Duffy, the promise was not as simple and straightforward as Mr. Duffy claims. As we understand it, Mr. Prestopine did not promise Mr. Duffy that Mr. Duffy would be reimbursed if he merely paid the above fees and costs out of his own pocket. Mr. Prestopine instead promised Mr. Duffy that Mr. Duffy would be reimbursed if he paid the fees and costs out of his own pocket *and if debtor and Mr. and Mrs. Duffy indicated in writing their acceptance of the terms and conditions of the September 5, 2000, commitment letter and the final closing therefore went forward.*

- 24 -

Mr. Prestopine informed Mr. Duffy and others who attended the pre-closing that debtor and Mr. and Mrs. Duffy had not yet accepted the terms and conditions of the commitment letter issued on September 5, 2000, but that there still was for time for them to do so before the scheduled final closing was to go forward.  If they failed to do so, the final closing obviously would not go forward.

With this additional background, it is obvious why Mr. Prestopine did not, as debtor and Mr. Duffy claim, make the simple promise to Mr. Duffy that he would be reimbursed if he paid the fees and costs out of his own pocket.   Reimbursement was not contingent solely upon Mr. Duffy paying the fees and costs out of his own pocket.  It also was contingent upon debtor and Mr. and Mrs. Duffy signifying in writing their acceptance of the terms and conditions in the commitment letter issued on September 5, 2000, in which case the final closing set for the following week would take place.  We have indicated that the final closing did not occur because they did not sign the commitment letter.

We conclude in light of the foregoing that the second of the above requirements of promissory estoppel is not satisfied in this instance.  Mr. Duffy did not take action on the basis of the promise made by Mr. Prestopine.  While Mr. Duffy did pay the fees and costs due at the pre-closing, he did not take action to assure that the final closing took place by signifying in writing debtor's and Mr. and Mrs. Duffy's acceptance of the commitment letter of September 5, 2000.

Finally, we conclude that the third requirement for primary estoppel also is not satisfied in this instance.  Because Mr. Duffy acted in reliance on only one of the two

- 25 -

AO 72A
(Rev. 8/82)

conditions implicit in the promise, there is no need to award Mr. Duffy the amount he paid out of his own pocket at the pre-closing if justice is to be avoided.

To the contrary, injustice would result if Bank were required to reimburse Mr. Duffy when Mr. Duffy satisfied only one part of the conditional alleged promise Mr. Prestopine made. Responsibility for failure to satisfy the second part of the conditional lies with Mr. Duffy because debtor and he and Mrs. Duffy did not indicate in writing their acceptance of the terms and conditions of the commitment letter Bank issued on September 5, 2002. Bank did nothing to prevent them from doing so.

We conclude in light of all of the foregoing considerations  that judgment should be entered in favor of Bank and against debtor and Mr. Duffy.  An appropriate order shall issue.

**BERNARD MARKOVITZ**
U.S. Bankruptcy Judge

Dated: _4-2-8-06_

FILED

APR 2 8 2006

- 26 -

AO 72A
(Rev. 8/82)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

**CEDA MILLS, INC.,**                    :      **Bankruptcy No. 04-24452 BM**
                                         :
                                         :
         **Debtor**                      :      **Chapter 11**
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
**CEDA MILLS, INC., a corporation, and** :
**CHESTER E. DUFFY, an individual**      :
                                         :
         **Plaintiffs**                  :
                                         :
         **v.**                          :      **Adversary No. 05-2271 BM**
                                         :
**SKY BANK,**                            :      **Trial On Complaint For Breach Of**
                                         :      **Written  Contract  And Breach Of**
         **Defendant**                   :      **Oral Contract**

### ORDER OF COURT

**AND NOW**, this _28th_ day of _April_, 2006, in accordance with the preceding

memorandum opinion, it hereby is **ORDERED**, **ADJUDGED** and **DECREED** that

**JUDGMENT** be and hereby is entered **IN FAVOR OF** defendant Sky Bank and **AGAINST**

Ceda Mills, Inc. and Chet E. Duffy.

It is **SO ORDERED**.

_____
**BERNARD MARKOVITZ**
U.S. Bankruptcy Judge

Service of the Memorandum Opinion and Order of Court shall be made on the following
parties:
      Robert O Lampl, Esq.
      Elene Mountis Moran, Esq.
      Jeffrey J. Lorek, Esq.
      Kathleen Robb, Esq. o/b/o Office of United States Trustee

FILED

APR 28 2006

CLERK, U.S. BANKRUPTCY COURT
WEST. DIST. OF PENNSYLVANIA

AO 72A
(Rev. 8/82)